1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                          SOUTHERN DISTRICT OF CALIFORNIA

10   CHRISTOPHER NERO; MARIA NERO,          Civil No.    09cv958- POR

11                              Plaintiffs,
                                            **FINDINGS OF FACT AND**
12              v.                          **CONCLUSIONS OF LAW**

13   NITA EVANS, *an individual and Trustee of*
     *the Evans Family Trust*; JAMES TONDELLI,
14   SR.; PRESIDIO MORTGAGE, INC.;
     CALPACIFIC MORTGAGE
15   CONSULTANTS; DOES 1 THROUGH 20,

16                              Defendants.

17                              **I. INTRODUCTION**

18          On May 5, 2009, Plaintiffs Christopher and Maria Nero filed a Complaint alleging twenty-

19   one claims against Defendants Nita Evans ("Evans"), individually and as trustee of the Evans

20   Family Trust UDT Dated 3-10-86 ("the Evans Family Trust"), James Tondelli Sr. ("Tondelli"),

21   Presidio Mortgage, Inc. ("Presidio"), CalPacific Mortgage Consultants ("CalPacific"), and Does 1

22   through 20.[1]  (ECF No. 1.)  Plaintiffs subsequently settled with Defendants CalPacific, Nita Evans

23   and the Evans Family Trust. (ECF Nos. 9 and 29.)

24          On October 8, 2010, the Honorable Dana M. Sabraw held a Pretrial Conference, during

25   which Plaintiffs were informed for the first time that their attorney, Kent Wilson, had resigned from

26   the California State Bar so that they had no attorney to represent them at trial.  (*See* ECF No. 33.)

27   _____

28          [1] Plaintiffs settled with Jim Potts of CalPacific prior to filing this action.

1   The Court continued the trial for 30 days to allow Plaintiffs to obtain new counsel.  (*Id.*)  On

2   November 5, 2010, Orlando Foote, Esq., the new counsel, filed his appearance as Plaintiffs' attorney

3   of record.  (ECF No. 38.)   The parties consented to Magistrate Judge jurisdiction on March 1, 2011.

4   (ECF No. 52.)

5          At the time of the original Pretrial Conference, Plaintiffs' allegations stemmed from the 2009

6   foreclosure proceedings against their home on Cahuilla Avenue in Imperial, California.[2]  However,

7   at the May 3, 2011 Pretrial Conference held before Magistrate Judge Louisa S Porter, Plaintiffs' new

8   attorneys disclosed an intention to present evidence at trial on the theory that Defendants engaged in

9   a pattern or practice of predatory lending.  Counsel then indicated that both loans obtained by

10  Plaintiffs from Evans and Presidio would be relevant to the issues of the case: the 2006 loan for the

11  purchase of the Dennis Court Property ("the First Loan") and the 2007 loan for the purchase of the

12  Cahuilla Property ("the Second Loan").  Plaintiffs also abandoned nine claims, leaving the following

13  claims against Defendants Tondelli and Presidio: (1) intentional misrepresentation; (2) breach of

14  fiduciary duty; (3) breach of covenant of good faith and fair dealing; (4) violation of California

15  Financial Code § 4970, et seq.; (5) negligence; (6) accounting; (7) violation of the Real Estate

16  Settlement Procedures Act, 12 U.S.C. §§ 2601, et seq.; (8) violation of California Business and

17  Professions Code §§ 17200, et seq.; (9) violation of California Civil Code § 2923.5; (10) violation of

18  California Civil Code § 1572; (11) conspiracy; and (12) breach of contract.  (*See* ECF No. 66 at 21.)

19         The parties waived jury trial on April 19, 2011 (ECF No. 62) and a bench trial commenced

20  before Judge Porter on  May 9, 2011.

21         The Court provided Plaintiffs with considerable latitude in allowing them to (1) change their

22  arguments after the pretrial conference before District Judge Sabraw, and (2) permitting Plaintiffs to

23  subpoena documents directly to Court on the first day of trial.  However, at the Pretrial Conference

24  before Magistrate Judge Porter, Plaintiffs attempted to add an expert witness, Winston P. Ohrn.

25  Upon objection by counsel for Defendants, the Court struck Mr. Ohrn as a potential witness.  At no

26

27         [2] There are three properties at issue in this case.  The Court refers to the property Plaintiffs' received from Mr.
28  Nero's grandmother as the "San Diego Property."  The Court refers to the first home Plaintiffs purchased in Imperial as the
    "Dennis Court Property" and the second home they purchased in Imperial as the "Cahuilla Property."

time did either party seek a continuance.  Plaintiffs also attempted to supplement the record after the trial had ended, which was denied by the Court in an Order stating, "[the Court] will not accept additional evidence at this stage of the proceedings."  (ECF No. 80).

## II. JURISDICTION

Plaintiffs filed the instant action in federal court on May 5, 2009.  (ECF No. 1.)  In the Pretrial Order dated February 18, 2011, the Honorable Dana M. Sabraw found the Court had jurisdiction, including subject matter jurisdiction over the matter.  (*See* ECF No. 49 at 3.)  However, at the time of trial, Plaintiffs had abandoned all of their federal causes of action save the violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601(b)(2).  (*See* ECF No. 66 at 26.)  As noted below, RESPA does not apply to the loans at issue.  Though it is within the Court's discretion to remand the state law causes of action, the Court finds that Plaintiffs' claims arise from the same common nucleus of operative facts and are also so intertwined that the interests of efficiency and judicial economy prevail.  The Court elects to exercise supplemental jurisdiction under 28 U.S.C § 1367 and decide Plaintiffs' state law causes of action as well.

## III. FINDINGS OF FACT

Based upon stipulated facts, findings of fact in the Pretrial Order and the evidence presented at trial, this court makes the following Findings of Fact:

Plaintiff, Christopher Nero, was employed by the Imperial County Irrigation District for eleven years prior to the events that gave rise to the instant action. In 2003 he sustained a serious injury to his left shoulder while performing his job as a water patrol which resulted in significant pain and loss of work. Although he had every intent to return to work, Christopher Nero was off work on temporary disability and receiving workers compensation benefits until mid 2007.  For the 2 ½ years prior to 2005, Plaintiffs lived in a mobile home in Imperial, California.  The Nero household consisted of Christopher, Maria, and their two children.  Plaintiffs, Christopher and Maria Nero, had not previously owned real property or applied for a mortgage and were unfamiliar with those processes.

In 2005, Mr. Nero's grandmother deeded to him her home located on Demus Street in San Diego, California which was free and clear of any liens ("the San Diego Property").  Despite

receiving title to the San Diego Property, Plaintiffs desired to purchase a home of their own in Imperial.  They contacted Joe McCormick[3], a real estate agent, and, with his assistance, located a home on Dennis Court in Imperial ("the Dennis Court Property"). Plaintiffs' credit rating was abysmal and therefore they could not qualify for any conventional loan to purchase the Dennis Court Property.[4] Because of this, McCormick referred Plaintiffs to Jim Potts and CalPacific to explore financing options.  After reviewing their credit score and loan application with stated income, Potts advised Plaintiffs that they could not qualify for either a conforming loan or a sub-prime mortgage, but there was still hope for them to obtain a loan.  He told them he would "put them in the system." Because Potts was not licensed to secure hard-money loans, he contacted Dale Huntley at Presidio, who specialized in originating private loans, to discuss possible hard-money lending.

On January 18, 2006, Plaintiffs signed an Agency Agreement with Presidio ("the 2006 Agency Agreement").  (Exhibit 34.)  In it, Plaintiffs agreed to appoint Presidio as their exclusive agent to find and procure a lender and complete a loan agreement on their behalf for a stated commission.  In return, Presidio agreed to use its best efforts to secure a lender for Plaintiffs.  The agreement for the exclusive agency appointment was limited to one month and was irrevocable until February 18, 2006. The Agency Agreement expressly disclosed that a dual-agency relationship may exist as Presidio may also be an agent for the lender.

That same day, Plaintiffs completed and signed a Loan Purpose Statement (Exhibit 49) in which Plaintiffs represented the loan would be used for the purchase of real property and for business purposes, i.e., to purchase the Dennis Court Property and to renovate the San Diego Property for sale or rental.[5]  In this transaction, all documents were sent to Potts and signed by the Plaintiffs at the same time, which included the agency agreement and the disclosure statement setting forth the commission, loan amount and terms.  In particular, it proposed loan terms of 10.5% interest for 5 years, with interest only payments and a balloon payment at the end of the 5 year term.

---

[3] Joe McCormick is not named as a Defendant in this case.

[4] Testimony at trial from Defendant Tondelli was it was the worst credit score he had seen in years.

[5] For all relevant claims, the First Loan is not a "covered" loan as discussed in Section G below.

1   These terms were approved by the Neros.  Based on the testimony, it remains unclear who proposed

2   the total loan amount.  Potts testified that the Neros initial request was a "cash out" loan on the San

3   Diego Property to enable them to purchase the Dennis Court Property for cash. However, the San

4   Diego property did not appraise sufficiently for such a loan resulting in both properties being

5   required for the loan collateral.  Based on this change the Neros requested a loan sufficient to

6   purchase the Dennis Court property, provide them with cash to fix up the San Diego Property and to

7   pay off debt.  Nita Evans, a 92 year old private hard-money lender, agreed to lend $350,000 to the

8   Neros.  Plaintiffs did not have any contact with Tondelli during the loan application process.

9        The Loan Escrow Instructions, signed by Tondelli and Christopher Nero, confirm that both

10  the Dennis Court Property and the San Diego Property were encumbered as security for the loan.

11  (Exhibit 43.)  The two homes had a combined value of $686,000, which was a sufficient loan to

12  value ratio to support the $350,000 loan. The Mortgage Loan Disclosure Statement, signed by both

13  Plaintiffs, reflects the loan amount and lien on both properties.  (Exhibit 35.)  On February 3, 2006,

14  both Plaintiffs signed and recorded a Short Form Deed of Trust and Assignment of Rent documents

15  for the Dennis Court and San Diego Properties, which designate Evans and the Evans Family Trust

16  as beneficiary of the properties. (Exhibits 2 and 3.)  Despite this documentation, Plaintiffs testified it

17  was their belief that the San Diego Property would be the only property encumbered by this loan.

18  The Neros both testified that they were rushed into signing loan document papers.  Conversely, Potts

19  testified it was his practice to explain the terms and conditions of a loan to his clients. Despite the

20  conflicting testimony, the Court finds that both the San Diego Property and the Dennis Court

21  Property were encumbered as security for the first loan.

22       The Dennis Court Property was purchased for $268,500.[6]  (Exhibit 1.)  The February 3, 2006

23  Settlement Statement on the Dennis Court Property reveals a total settlement charge of $49,353.97,

24  which included the following: $17,500 commission to Presidio; $955 processing fee to Presidio; and

25  $7750 commission to CalPacific.  (*Id.*)  The statement further indicates that Plaintiffs received

26  $32,929.11 in cash.  (*Id*.)  The Plaintiffs used these funds to pay off various debts, including Mrs.

27

28       [6] The Court refers to the Dennis Court transaction as the "First Loan."

1  Nero's approximately $18,000 car loan.  Plaintiffs also invested approximately $10,000 to renovate

2  the San Diego Property.  Plaintiffs then opted to sell the San Diego Property rather than rent it. An

3  unnamed San Diego realtor advised the Neros that the property would show better if empty. Based

4  on this advice, the Neros did NOT rent the San Diego property during the time the property was

5  listed for sale but listed the home for its loan appraised value of $418,000.  However, it was on the

6  market for over a year with no offer.  During that time period, the market for single family homes

7  entered a downward cycle and Plaintiffs derived no revenue from the San Diego Property.

8       The monthly payment on the First Loan was $3,062.50. Plaintiffs made nine timely payments

9  totaling approximately $27,000.  During this time period, Plaintiffs paid interest on the loan and

10  even attempted to pay additional amounts towards the principal.  Evans rejected these excess

11  payments, claiming it would be "too difficult" for her to do the book-keeping if the Neros on

12  occasion paid varying amounts towards the principal. Evans applied the extra payments to the

13  following month's interest payment.

14       After nine payments, based on the Neros then-stated combined incomes of $3,600 per month,

15  Plaintiffs could no longer afford the $3000 monthly payments and became fearful of foreclosure on

16  the property.  Mr. Nero testified he contacted Evans to explain their inability to make the monthly

17  payments and asked Evans to take the San Diego Property in forgiveness of the loan.  According to

18  Mr. Nero's testimony, Evans responded, "Why?  I have both homes as security for the loan."

19  Despite the fact that his signature appears on the Loan Escrow Instructions (Exhibit 43), Mortgage

20  Loan Disclosure Statement (Exhibit 35) and Deed of Trust (Exhibit 2), Mr. Nero claimed this was

21  the first time he was aware of the lien on the Dennis Court Property.

22       Mr.  Nero testified that he feared an impending foreclosure and that Evans would take both

23  properties. Even though the Neros were not making payments, Nita Evans never initiated foreclosure

24  proceedings on the properties. Plaintiffs attempted unsuccessfully to sell the San Diego Property.

25  The Dennis Court Property had insufficient value to cover the First Loan and property values in

26  Imperial were significantly depressed by that time.

27       Mrs. Nero gave birth to their third child during this period.  She testified that they needed a

28  home with more room to accommodate the larger family.  By December, 2006 and with the

assistance of Joe McCormick, Plaintiffs located the Cahuilla home in Imperial ("the Cahuilla Property"). Plaintiffs located this home before they sold either the San Diego Property or the Dennis Court Property.  They would be able to close on the Cahuilla Property as soon as they acquired the the money but that required that they sell both the San Diego and Dennis Court properties to proceed with the purchase.  Their credit had not improved since the First Loan transaction, so once again they could not qualify for either a conforming or sub-prime mortgage. Faced with this circumstance, McCormick again referred Plaintiffs to Potts and CalPacific to assist in financing.  Potts informed the Plaintiffs that their only option for financing would be a hard-money loan from Presidio and Evans.

On January 9, 2007, Plaintiffs signed a second Agency Agreement with Presidio ("the 2007 Agency Agreement").  (Exhibit 10.)  In exchange for a $11,480 commission, Plaintiffs agreed to appoint Presidio as their exclusive agent to find a lender and complete a loan agreement.  In return, Presidio again agreed to use its best efforts to secure a lender.  The agreement provided the agency appointment was irrevocable until February 19, 2007.  Identical to the 2006 Agency Agreement, this agreement notified Plaintiffs that a dual-agency relationship may exist.  Plaintiffs had no contact with Tondelli during the second loan application process; all dealings were with Mr. Potts.

Surprisingly, Plaintiffs sold both the Dennis Court Property and the San Diego Property within weeks of one another.  According to the January 10, 2007 Settlement Statement for the San Diego Property, Plaintiffs paid off the First Loan of $350,000, netting an additional $130,000 from the sale of the properties.  (Exhibit 15.)  They also paid $14,700 to Evans as a "prepayment penalty" on the First Loan.  (*Id.*)  Plaintiffs never requested forgiveness of the penalty.  However, at trial, all of the witnesses testified that had Plaintiffs waited two weeks, the prepayment penalty provision of the First Loan would have expired and they would not have owed this amount to Evans.  According to Potts' testimony, it was against his advice that the Neros insisted on closing on the Cahuilla Property as quickly as possible.

Approximately two weeks later, on January 24, 2007, Plaintiffs closed on the Cahuilla Property.  (Exhibit 23.)  The Neros purchased the home for $264,000, using $100,000 from the sale of the Dennis Court and San Diego Properties as a down payment.  Evans financed the remainder

with a new $164,000 loan.[7]  (*Id.*)  The Settlement Statement on the Cahuilla Property reveals a total settlement charge of $15,581.06, which included the following disbursements: $8200 commission to Presidio; $955 processing fee to Presidio; and $3280 commission to CalPacific.  (Exhibit 23.)

The Second Loan issued under the same terms as the First Loan; except the interest rate increased by one point to 11.5%.  The Loan Purpose Statement indicates the Second Loan was secured only for the purchase of residential property.[8]  (*See* Exhibit 25.) The Second Loan obligated Plaintiffs for monthly interest-only payment to Evans reduced to $1571.67.  At this time, Plaintiffs still had a combined income of $3600 a month and testified they were happy with the monthly payments on the loan.  However, the parties presented conflicting evidence regarding a promise to refinance.  The Plaintiffs testified to being promised the opportunity to refinance after one year and entered the Second Loan in reliance on that promise.  Tondelli testified, however, that no such promise was made. The Plaintiffs' testimony at trial also conflicted with their earlier deposition testimony.  Mr. Nero stated in his deposition that there was no promise to refinance the Second Loan after one year.  Mrs. Nero's deposition testimony was identical to her husband's on this issue.  The court finds that based on the lack of contact with Tondelli or Presidio, the only remaining Defendants in this case, the claimed promise was not made by either Tondelli or Presidio.

After making only four payments on the Second Loan, Plaintiffs' circumstances changed dramatically.  When Christopher Nero received the loan on the Cahuilla Property, he believed he would be going back to work. While fully employed he earned a monthly salary of $4,186.00.  Mr. Nero's medical condition rendered him unable to return to work and his worker's compensation benefits ceased after two years of payments.  Plaintiffs then sought assistance from Mr. Nero's grandparents, who paid an additional two months payments on the Second Loan.  Mr. Nero also contacted his employer for assistance where he was informed of his company-sponsored long-term disability insurance policy with Hartford Insurance.  Mr. Nero started to collect $2400 per month from this policy, but the payments arrived late on numerous occasions.  Moreover, Mr. Nero's

---

[7] The Court refers to the Cahuilla Drive transaction as the "Second Loan."

[8] For all relevant claims, the Second Loan is considered a "covered" loan as discussed in Section G below.

growing medical problems required the Plaintiffs to make more visits to a doctor in San Diego, which increased the family's expenses.  At the same time, the family's income decreased because Mrs. Nero often took time off of work to accompany her husband to these appointments.  At some point, Plaintiffs relayed their situation to Evans, who told them to "hurry and make your payments."

Fourteen months after the Second Loan, Mr. Nero called Tondelli and asked for help refinancing the Second Loan under the Agency Agreement.  According to Mr. Nero's testimony, Tondelli chuckled and said "I am Nita's agent, not yours."  Mr. Nero then contacted Evans directly, who said she would get in touch with Tondelli.  By October 2008, Plaintiffs had also contacted the Doan Law Firm for assistance in modifying their mortgage payments.  (*See* Exhibits 44-45.)  Plaintiffs' then attorneys negotiated with Evans on their behalf.  (*Id.*) It is unclear when Evans presented Plaintiffs with loan modification options, but it is clear she made two oral offers to modify the Second Loan (as detailed below), both of which were rejected by Plaintiffs.[9]

Shortly after this rejection, Tondelli served Plaintiffs with a Notice of Default.  (*See* Exhibit 27.)  A written declaration containing Evans' attempts to modify the loan, however, was not provided with the Notice of Default.  The Default (Exhibit 27), recorded on November 5, 2008, lists Presidio as the duly appointed trustee on the Deed of Trust (Exhibit 18), executed by Plaintiffs on January 16, 2007.  Plaintiffs then filed an Ex Parte Application for Temporary Restraining Order in Imperial County Superior Court to stop the foreclosure.  However, they were unable to post the $10,000 bond required for that relief.  (*See* Exhibits 46-47.)  The Neros remained in the Cahuilla Property without making payments for a number of months.  At some point, they moved in with Mrs. Nero's parents, where they currently reside.

On February 11, 2009, Presidio recorded the Notice of Trustee's sale of the Cahuilla Property setting the date and time of sale for March 5, 2009 at 3:00 p.m.  (Exhibit 28.)  Evans, who took ownership of the Cahuilla Property as the credit bidder, passed away while this action was

---

[9] Plaintiffs had failed to pay property taxes. Based thereon, Evans offered 2 options: 1) Neros pay the back taxes and add the unpaid amounts to the back end of the loan; or 2) Deed the property to Evans, she would pay the back taxes, the Neros could rent for three years and buy the property back from her at the end of the three years.

1   pending.[10]  The property is presently held in the Estate of Nita Evans.

2                                **IV. CONCLUSIONS OF LAW**

3   **A.     Joint Venture**

4           As a preliminary matter, Plaintiffs argue Defendants Tondelli and Presidio engaged in a joint

5   venture with Potts to generate commissions by securing hard-money loans.  Because Potts was not

6   licensed to broker hard-money loans, Plaintiffs contend Potts had to cooperate with Defendants to

7   secure the loan transactions in this case.  Plaintiffs contend this created a joint venture such that,

8   even though Plaintiffs settled with Potts, Defendants Tondelli and Presidio may be held liable for

9   any of Potts' misrepresentations or predatory lending practices.

10          Defendants contend that no joint venture existed.  At best, Potts and Defendants were

11  cooperating brokers under California real estate law and the transaction at issue in this case was a

12  simple referral by Potts to Defendants.

13          "A joint venture exists where there is an agreement between the parties under which they

14  have a community of interest, that is, a joint interest, in a common business undertaking, an

15  understanding as to the sharing of profits and losses, and a right of joint control."  *Bank of California*

16  *v. Connolly*, 36 Cal. App. 3d 350, 364 (1973) (internal quotations omitted); *see also Kaligian v.*

17  *Menezes*, 36 Cal. App. 4th 573, 586 (1995); CA BAJI 13.40 (Spring 2011 Ed.).  An essential

18  element of a "joint venture is the right of joint participation in the management and control of the

19  business.  Absent such right, the mere fact that one party is to receive benefits in consideration of

20  services rendered" does not, as a matter of law, make him a joint venturer.  *Bank of California*, 36

21  Cal. App. 3d at 364 (internal citations omitted).  "Whether a joint venture relationship exists is a

22  question of fact, depending on the intention of the parties."  *Pellegrini v. Weiss*, 165 Cal. App. 4th

23  515, 525 (2008) (citing *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 820 (1983)); *see also*

24  *Preach v. Monter Rainbow*, 12 Cal. App. 4th 1441, 1457 (1993).

25          Here, there is no evidence in the record that Defendants and Potts intended to form a joint

26  venture.  Although Potts had worked with Presidio on multiple occasions, he testified he referred

27

28          [10] Plaintiffs settled with Evans' estate after her death but before trial.

                                        - 10 -                                        09cv958

1   Plaintiffs to Presidio in this case only because they would not qualify for conforming or sub-prime

2   mortgages from any other lender.  According to Potts, he "had no other option" to secure a lender for

3   the Neros.  Even assuming the loan transactions at issue constituted a "common business

4   undertaking," there is no indication Potts and Presidio shared a right of joint control.  In fact, the

5   limited evidence presented suggests Potts and Presidio performed different roles during the loan

6   application process.  Potts prepared the loan applications and interacted with Plaintiffs, but he had

7   no ability to locate or secure a loan.  On the other hand, Tondelli and Presidio did not have a license

8   to prepare loan applications or secure any loans other than hard-money loans.  In fact, Presidio

9   secured a lender for Plaintiffs without any participation from Potts, then sent a series of documents

10  to Potts' office for Plaintiffs to sign.  While Presidio and CalPacific, Potts' employer, both received

11  commissions based on their individual roles in the loan process, commissions which were fully

12  disclosed to Plaintiffs, each performed different functions in the process.  (*See* Exhibits 1 and 23.)

13  At closing, Plaintiffs cited *Gray v. Jannss Investment Co.*, 186 Cal. 634 (1921), for the

14  premise that mere cooperation among real estate brokers is sufficient to form a joint venture.  In

15  *Gray*, plaintiffs, real estate brokers, brought action against defendants, also real estate brokers, to

16  recover a portion of the commission paid for an exchange of property.  In *Gray*, plaintiffs alleged

17  that after a series of negotiations, the parties entered an oral agreement to cooperate in the

18  transaction and share the commission.  Based on the partnership between the parties, the Supreme

19  Court of California held plaintiffs were entitled to real property received by defendants as

20  commission from the exchange.  186 Cal. at 642-43.

21  While cooperating brokers may form a partnership or joint venture under some

22  circumstances, *Gray* does not support the proposition that cooperation alone is sufficient to form a

23  joint venture.  Evidence that Potts cooperated with Presidio does not establish a joint venture absent

24  the parties' intention and the essential element of a right to joint control.  *See Bank of California*, 36

25  Cal. App. 3d at 364.  Accordingly, the Court finds there is insufficient evidence of a joint venture

26  and therefore Defendants cannot be held liable for Potts' alleged misconduct on that basis.

27  ///

28  ///

1  **B.      Conspiracy**

2         Although not specifically argued at trial, in Count 20 of their Complaint, Plaintiffs argue

3  Defendants may also be liable for Potts' actions on the basis of a conspiracy.  "Conspiracy is not a

4  cause of action, but a legal doctrine that imposes liability on persons who, although not actually

5  committing a tort themselves, share with the immediate tortfeasors a common plan or design in its

6  perpetration."  *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994).

7  "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts

8  of other coconspirators within the ambit of the conspiracy.  In this way, a coconspirator incurs tort

9  liability co-equal with the immediate tortfeasors."  *Id.* at 511.

10        To prove a claim for civil conspiracy, Plaintiffs must establish: "(1) the formation and

11 operation of the conspiracy, (2) the wrongful conduct in furtherance of the conspiracy, and (3)

12 damages arising from the wrongful conduct."  *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th

13 1571, 1581 (1995) (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511

14 (1994)); *see also Doctor's Company v. Superior Court*, 49 Cal. 3d 39, 44 (1989).  "The sine qua non

15 of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful

16 objective and their intent to aid in achieving that objective."  *Kidron*, 40 Cal. App. 4th at 1581

17 (internal quotations omitted.)  "Mere association does not make a conspiracy."  *Id.* at 1582.

18        Plaintiffs seem to suggest Potts and Defendants conspired to place them in situations where

19 they were "bound to fail."  It is unclear from the record what Plaintiffs contend was the object of the

20 alleged conspiracy.  The Court presumes, based on arguments presented at trial, that the object of the

21 conspiracy was the generation of commissions and foreclosure of the properties.  Yet, there is no

22 evidence of any agreement between Defendants and Potts whatsoever, let alone a conspiratorial

23 agreement, to generate commissions or prey upon Plaintiffs' poor credit history and coerce them into

24 loans they could not afford.[11]  The record demonstrates only that Potts referred Plaintiffs to Presidio

25 because he was unable to secure any other lender.  If Potts committed any wrongful acts during the

26 loan application process, there is no evidence he did so in furtherance of a conspiratorial agreement,

27 —————————————————

28        [11] Although Plaintiffs do not seem to argue Defendants conspired with CalPacific, Potts' employer, the testimony
in the record also indicates Defendants did not have any agreement in place with CalPacific.

1    or that Defendants had any knowledge of Potts' allegedly "unlawful objective." *Kidron*, 40 Cal.

2    App. 4th at 1581.  Accordingly, the Court finds there is insufficient evidence to establish a

3    conspiracy and thus Defendants cannot be held liable for Potts' alleged misconduct on that basis.

4    **C.      Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, et seq.**

5         Plaintiffs contend Defendants violated Real Estate Settlement Procedures Act, 12 U.S.C.A.

6    § 2607 (RESPA) by providing kickbacks as part of a real estate settlement service and providing a

7    fee portion for real estate settlement services.  Specifically, Plaintiffs argued that because Nita Evans

8    most likely deposited the Neros' mortgage payment checks in a federally insured bank account,

9    RESPA governed their loans.

10        RESPA governs "federal related mortgage loans," which include loans "made in whole or in

11   part by any lender the deposits or accounts of which are insured by any agency of the Federal

12   Government, or is made in whole or in part by any lender which is regulated by any agency of the

13   Federal Government."  12 U.S.C.A.  § 2602 (1)(B)(I).

14        There is no evidence in the record to indicate that the loans at issue in this case are covered

15   by RESPA.  Both Plaintiffs and Defendant Tondelli testified that both the First and Second Loans

16   were hard-money loans from Nita Evans, loans which are not insured by any agency of the Federal

17   Government.  Further, no evidence was presented at trial that Nita Evans was regulated by any

18   agency of the Federal Government.  Specifically, no evidence was presented that Ms. Evans ever

19   deposited Plaintiffs' mortgage payment checks in a federally insured bank.  Regardless, the Court

20   does not find Plaintiffs' far-reaching argument compelling.  Thus, Defendants did not violate 12

21   U.S.C.A. § 2607.  Accordingly, Plaintiffs are not entitled to any recovery under this statute.

22   **D.      Intentional Misrepresentation**

23        In Count 1 of the Complaint, Plaintiffs allege Defendants knowingly misrepresented material

24   information during the loan application process.  Under California law, Plaintiffs must establish the

25   following essential elements for a claim of fraud by an intentional misrepresentation:

26        1.      Defendants made a representation as to a past or existing material fact;

27        2.      The representation was false;

28        3.      Defendants must have known that the representation was false when made;

4.   Defendants made the representation with an intent to defraud Plaintiffs, that is, Defendants must have made the representation for the purpose of inducing Plaintiffs to rely upon it and to act or to refrain from acting in reliance thereon;

5.   Plaintiffs were unaware of the falsity of the representation; must have acted in reliance upon the truth of the representation and must have been justified in relying upon the representation;

6.   And, finally, as a result of the reliance upon the truth of the representation, Plaintiffs sustained damage.

CA BAJI 12.31 (Spring 2011 Ed.).

Plaintiffs seem to allege three misrepresentations: (1) Defendants misrepresented Plaintiffs' income on loan application documents; (2) Defendants misrepresented that the San Diego Property was the only property secured as collateral for the First Loan; and (3) Defendants misrepresented Plaintiffs would have the option to refinance the Second Loan.

    1.   Misrepresentation of Income

Plaintiffs allege Potts inflated their monthly income on loan application documents, thereby securing a loan Plaintiffs could not afford.  However, even assuming Plaintiffs' allegations are true, Defendants cannot be held liable for Potts' actions.  First, Potts was not a Defendant at the time of trial, as Plaintiffs had settled with him.  Further, as discussed above, the Court finds there is neither a joint venture nor a conspiracy between Defendants and Potts.  Based thereon, Plaintiffs are not entitled to recovery on this ground.

    2.   Collateral for First Loan

Plaintiffs further allege Defendants misrepresented that only the San Diego Property was encumbered as collateral for the First Loan.  The Neros testified they believed the First Loan was secured by the San Diego Property only and not the Dennis Court Property.   The Loan Escrow Instructions (Exhibit 43) signed by Mr. Nero, and the Mortgage Loan Disclosure Statement (Exhibit 35) signed by both Plaintiffs, clearly indicate a lien was placed on both the Dennis Court Property and the San Diego Property. Apart from Plaintiffs' allegations, there is no evidence that any Defendants intentionally misrepresented the terms and conditions of the First Loan to Plaintiffs.  Conversely, the record indicates that Plaintiffs knew or should have known that both properties were encumbered.  Accordingly, Plaintiffs are not entitled to relief on this ground.

1        3.      Option to Refinance Second Loan

2        Lastly, Plaintiffs allege Defendants misrepresented they would have an option to refinance

3  the Second Loan after one year.  However, there is insufficient evidence to conclude Defendants

4  made such a misrepresentation.  Although Plaintiffs testified at the time of trial they were promised

5  the option to re-finance after one year, there is no evidence in the record such a promise was made

6  by either Potts or Defendants. In fact, at time of deposition, both Plaintiffs acknowledged there was

7  no promise to re-finance. Further, Tondelli himself testified that no such promise was made by him

8  or Presidio.  Based thereon, the Court cannot conclude Defendants intentionally misrepresented an

9  option to refinance the Second Loan.  Thus, Plaintiffs are not entitled to relief on this ground.

10  **E.      Breach of Fiduciary Duty**

11        In Count 2 of the complaint, Plaintiffs contend "Defendants breached their fiduciary duty to

12  Plaintiffs, by acting dishonestly and failing to disclose material terms that would alter Plaintiffs'

13  loan repayment."  (ECF No. 1 at 10.)  At trial, Plaintiffs argued Defendants placed them in two

14  situations where they were "bound to fail, and they did."  Further, Plaintiffs argued Defendants

15  engaged in a pattern and practice of hard-money lenders acting like pawn brokers, thereby ignoring

16  their fiduciary duties to the Neros.

17        To establish a cause of action for breach of fiduciary duty, Plaintiffs must show "the

18  existence of a fiduciary relationship, its breach, and damage proximately caused by that breach.  The

19  absence of any one of these elements is fatal to the cause of action." *Pierce v. Lyman*, 1 Cal. App.

20  4th 1093, 1101 (1991); *Pellegrini*, 165 Cal. App. 4th at 524.  To be charged with a fiduciary

21  obligation, a party "'must either knowingly undertake to act on behalf and for the benefit of another,

22  or must enter into a relationship which imposes that undertaking as a matter of law.'" *City of Hope*

23  *Nat. Medical Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 385 (2008) (citing *Comm. on Children's*

24  *Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 221 (1983)).  In this case, Plaintiffs contend

25  Defendants were subject to two sets of fiduciary duties: those imposed by the Agency Agreements

26

27

28

1   and those arising from Defendants' position as mortgage brokers.[12]

2        1.        The 2006 and 2007 Agency Agreements

3        As Plaintiffs' exclusive agent under the 2006 and 2007 Agency Agreements, Plaintiffs argue

4   Defendants were charged with a duty to represent Plaintiff's best interests.  The scope of

5   Defendants' fiduciary duty under the Agency Agreements derives from the general law of agency.

6   *See* Rest. 3d Agency § 8.01 (2006 Ed.) ("An agent has a fiduciary duty to act loyally for the

7   principal's benefit in all matters connected with the agency relationship.").  Thus, here, Defendants'

8   duties under the Agency Agreements are limited to the scope of the agency as set forth in the

9   agreements themselves.  *See id.* at § 8.07; *Carleton v. Tortosa*, 14 Cal. App. 4th 745, 755 (1993)

10  (citing Rest. 2d Agency § 376 (1958 Ed.)).

11        a.        The 2006 Agency Agreement

12        The 2006 Agency Agreement states Presidio "agrees to use its best efforts during the Agency

13  appointment to secure a lender to make Borrowers a loan" in accordance with the terms of the

14  Mortgage Loan Disclosure Statement.  (Exhibit 34.)  In turn, the Mortgage Loan Disclosure

15  Statement provides that if the loan is made, Plaintiffs agree to pay the principal amount of $350,000

16  and interest at 10.5% per year, payable in sixty monthly payments of $3062.50 and a final/balloon

17  payment of $350,000 to pay off the loan in full.  (Exhibit 35.)  The record indicates Defendants

18  secured a loan that matched these terms.  Therefore, based on the record, there is no evidence

19  Defendants failed to represent Plaintiffs' best interests in satisfying the express purpose of the

20  Agency Agreement, i.e. to secure a lender to make Plaintiffs a loan in accordance with the terms of

21  the Mortgage Loan Disclosure Statement.

22        Although Defendants satisfied the express purpose of the 2006 Agency Agreement, Plaintiffs

23  seem to argue Defendants breached their duty to advise them of the risks associated with the terms

24  of the First Loan.  Specifically, Plaintiffs claim they could not afford a $350,000 loan, nor did they

25

26        [12] The Court notes Plaintiffs seem to misidentify Defendants as "real estate brokers" in pre-trial documents.  (*See*
27  ECF No. 66 at 22.)  Where a fiduciary duty is found to exist, Plaintiffs argue a "real estate agent must fulfill it by exhibiting
    the degree of care and skill ordinarily exhibited by professionals in the industry."  (*Id.*)  According to his testimony, Tondelli
28  acted as a mortgage broker, not a real estate broker, in this case.  Thus, the fiduciary duties of real estate brokers are not
    applicable.

need a loan of this amount to purchase the Dennis Court Property.  Plaintiffs further contend Defendants should have deterred them from encumbering the Dennis Court Property as collateral for the loan.  However, there is no evidence the 2006 Agency Agreement imposed a duty on Defendants to provide general financial advice during the loan application process.  Even so, the record suggests the First Loan may have been in Plaintiffs' best interests at the time.  The Neros were eager to own a home in Imperial, but they could not qualify for a conforming or sub-prime mortgage.  Given their financial situation, a hard-money loan from Evans was a reasonable option.  The First Loan also afforded Plaintiffs the opportunity to renovate the San Diego Property, pay-down other debts and rebuild their credit.  While the monthly payments comprised a substantial portion of their monthly income, Plaintiffs made nine timely payments on the First Loan, totaling approximately $27,000.

Based thereon, the Court finds Plaintiffs failed to demonstrate Defendants breached their fiduciary duties arising from the 2006 Agency Agreement.

### b.    The 2007 Agency Agreement

Similarly, the 2007 Agency Agreement states Presidio "agrees to use its best efforts during the Agency appointment to secure a lender to make Borrowers a loan" in accordance with the terms of the Mortgage Loan Disclosure Statement.  (Exhibit 10.)   The January 9, 2007 Mortgage Loan Disclosure Statement provides that if the loan is made, Plaintiffs agree to pay the principal amount of $164,000 and interest at 11.5% per year, payable in sixty monthly payments of $1571.63 and a final/balloon payment of $164,000 to pay off the loan in full.  (Exhibit 12.)  Plaintiffs admitted Defendants secured a loan that matched these terms.  Thus, based on the evidence before the Court, there is no indication Defendants failed to represent Plaintiffs' best interests in satisfying the express purpose of the 2007 Agency Agreement.

Plaintiffs also argue Defendants breached their duty to advise them of the risks associated with the terms of the Second Loan.  Again, nothing in the record suggests a second hard-money loan was not in Plaintiffs' best interests at the time.  Plaintiffs' credit had not improved since the First Loan transaction and they could not qualify for a conforming or sub-prime mortgage.  Without another loan from Evans, Mrs. Nero testified her family would have been homeless.  Moreover, there was no indication that Plaintiffs could not afford the Second Loan when they agreed to its

1    terms.  At the time, Plaintiffs had a combined monthly income of $3600 a month.  Under the Second

2    Loan, their monthly interest only payment to Evans was reduced to $1571.67.  There was no reason

3    for Defendants to anticipate Plaintiffs could not make these payments.  Indeed, Plaintiffs testified

4    they were happy with the terms of the Second Loan.

5            Furthermore, there is no evidence the Agency Agreement imposed a duty to act on Plaintiffs'

6    behalf after circumstances had changed and they could no longer afford their monthly payments.

7    The Agency Agreement provides the "agency appointment shall be irrevocable until February 19,

8    2007."  Mr. Nero testified Plaintiffs were able to make their payment under the Second Loan for

9    fourteen months, long after this date.  Even if the agency relationship survived, the Agreement

10   expressly states that "a dual-agency relationship may exist as [Presidio] may also be an agent for the

11   lender."  (Exhibit 10.)  The foreclosure of Plaintiffs' home does not impose liability on Defendants

12   for breach of the fiduciary duties arising from the Agency Agreement.

13           Accordingly, the Court finds Plaintiffs also failed to demonstrate Defendants breached their

14   fiduciary duties arising from the 2007 Agency Agreement.

15           2.        Fiduciary Duties of Mortgage Brokers

16           In addition to the fiduciary duties imposed by the 2006 and 2007 Agency Agreements,

17   Plaintiffs contend Defendants were subject to fiduciary duties arising from their position as

18   mortgage brokers.  Plaintiffs allege Defendants breached these duties by failing to disclose material

19   terms of the loans.

20           Under California law, mortgage brokers owe a fiduciary duty to their clients.  *See* CAL. FIN.

21   CODE § 4979.5(a) ("A person who provides brokerage services to a borrower in a covered loan

22   transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property,

23   is the fiduciary of the consumer.").  According to the California Supreme Court, mortgage brokers

24   have an obligation to "make a full and accurate disclosure of the terms of a loan to borrowers and to

25   act always in the utmost good faith toward their principals."  *Wyatt v. Union Mortgage Co.*, 24 Cal.

26   3d 773, 782 (1979).  This includes the duty to disclose all material facts that may affect the

27   principal's decision.  *Id.*  When brokering a loan for borrowers of modest means and limited

28   financial experience, mortgage brokers also have "duties of oral disclosure and counseling" with

1    regards to the material terms of the loan.  *Id.* at 783-84.

2         In *Wyatt v. Union Mortgage Co.*, an action against a mortgage broker seeking damages for

3    breach of fiduciary duty, plaintiffs testified they did not read the loan documents before signing

4    them, but instead asked their broker a series of questions regarding the terms of the loan, including

5    the rate of interest, late payments and the size of the balloon payment.  In response, the mortgage

6    broker provided "materially misleading and incomplete information."  *Id.* at 783.  Though the

7    correct terms were available on loan documents, the California Supreme Court concluded the

8    broker's material misrepresentations constituted a breach of his fiduciary obligations.  The Court

9    explained:

10
11       Here, the record discloses that respondents were persons of modest means and
         limited experience in financial affairs, whose equity in their home was their
12       principal asset.  They retained a mortgage loan broker to negotiate for them highly
         complex loan terms and they may be assumed to have justifiably relied on the
13       latter's expertise.  Against such a backdrop, the broker's failure to disclose orally
         the true rate of interest, the penalty for late payments or the swollen size of the
14       balloon payment clearly constituted breach of the broker's fiduciary obligations.  It
         is noteworthy also that the provisions regarding interest rate, late charges and
15       balloon payment were highly unfavorable to the borrower and yet the broker made
         no attempt to draw his clients' attention to these matters.

16    *Id.* at 783-84.

17         Although some cases have interpreted *Wyatt* as obligating mortgage brokers to orally

18    disclose the terms of the loan agreements and counsel borrowers on the loans' material terms,

19    including the rate of interest, possible penalties and balloon payment (*See Zimmer v. Nawabi*, 566 F.

20    Supp. 2d 1025, 1031-33 (E.D. Cal. 2008)), other cases have declined to extend *Wyatt* in such a

21    manner, concluding that such a broker has duties that "arise from a prohibition against making

22    affirmative misrepresentations rather than from a duty to explain the ins and outs of each loan

23    product."  *Stetler v. Greenpoint Mortgage Funding, Inc.*, 2008 WL 192405, *7 (E.D. Cal. 2008).

24         Plaintiffs failed to provide evidence that Defendants breached fiduciary duties owed to

25    Plaintiffs in this case.  Significantly, Plaintiffs did not present any evidence that Tondelli, Dale

26    Huntley, or any other Presidio employee failed to disclose all material facts that may affect

27    Plaintiffs' decision regarding their loans.  *Wyatt*, 24 Cal. 3d at 783. Conversely, Plaintiffs testified

28    they received the loan described in their loan documents.  Certainly, Defendants had a duty to

1   exhaustively explain issues that Plaintiffs did not understand. In this regard, Plaintiffs were free to

2   ask questions.  However, unlike the plaintiffs in *Wyatt*, the evidence shows Plaintiffs never asked

3   Defendants questions regarding the terms of their loans.  Consequently, Defendants never responded

4   to Plaintiffs' inquiries with affirmative misrepresentations.

5          Moreover, Plaintiffs failed to prove they incurred damages as a proximate result of

6   Defendants' alleged breach of fiduciary duty.  As to the First Loan, there is no evidence Plaintiffs

7   would have avoided the $14,700 prepayment penalty to Evans if counseled on the terms of the loan.

8   (*See* Exhibit 15.)  All of the witnesses testified that had Plaintiffs waited two weeks, the prepayment

9   penalty provision on the First Loan would have expired and they would not have owed this amount.

10  However, the evidence also indicates Plaintiffs were eager to purchase the Cahuilla Property.  Maria

11  Nero testified that after the birth of their third child, the family needed a home with more room.

12  Potts also testified Plaintiffs insisted on closing on the Cahuilla Property as quickly as possible.

13  Thus, the Court cannot determine with certainty whether Plaintiffs incurred damage as a proximate

14  result of Defendants' alleged breach of fiduciary duty.

15         As to the Second Loan, there is also no evidence Defendants' alleged failure to disclose

16  material terms proximately caused Evans to foreclose on the Cahuilla Property.  Plaintiffs admitted

17  that their financial circumstances changed dramatically after making four payments on the Second

18  Loan.  Christopher Nero's substantial medical problems increased Plaintiffs' expenses, while

19  simultaneously decreasing the family's earning capacity.  At the same time, the housing market

20  crashed nationwide and Plaintiffs' mortgage on the Cahuilla Property exceeded the value of the

21  home.  Christopher Nero conceded that but for these circumstances, Plaintiffs would have made their

22  payments on the Second Loan.  Accordingly, the Court cannot find Plaintiffs incurred damage as a

23  proximate result of Defendants' alleged breach of fiduciary duty.

24         Based on the foregoing, the Court concludes Plaintiffs failed to establish the essential

25  elements of breach of fiduciary duty.  Thus, Plaintiffs are not entitled to relief on this claim.

26  **F.      Negligence**

27         In Count 8 of the Complaint, Plaintiffs allege Defendants were negligent in placing them in

28  the loans at issue.  In particular, Plaintiffs suggest Defendants were negligent in relying on their

1  income as stated on loan application documents, thereby placing them in loans they could not afford.

2  At time of trial, however, Plaintiffs made no specific arguments related to their negligence claim.

3        The elements of an action for negligence are: (1) the existence of a duty; (2) a breach of that

4  duty; (3) causation between defendants' act or omission and plaintiffs' injuries; and (4) damages.

5  *Merill v. Navegar, Inc.*, 26 Cal. 4th 465, 477 (2001) (citing *Sharon P. v. Arman, Ltd.*, 21 Cal. 4th

6  1181, 1188 (1999)); *see also* CA BAJI 3.10 (Spring 2011 Ed.) (defining negligence as "the failure to

7  use ordinary or reasonable care").  "The existence and scope of a duty of care are legal questions for

8  the court."  *Merill*, 26 Cal. 4th at 477 (citing *Ann M. v. Pacific Plaza Shopping Ctr.*, 6 Cal. 4th 666,

9  674 (1993)).  Where a duty is found to exist, a professional "must fulfill it by exhibiting the degree

10  of care and skill ordinarily exhibited by professionals in the industry."  *Carleton v. Tortosa*, 14 Cal.

11  App. 4th 745, 754 (1993).  "The degree of care and skill required to fulfill a professional duty

12  ordinarily is a question of fact and may require testimony by professionals in the field if the matter is

13  within the knowledge of experts only."  *Id.* (citing *Miller v. Los Angeles County Flood Control Dist.*,

14  8 Cal. 3d 689, 702 (1973)).

15        Although Plaintiffs presented substantial evidence of Defendants' alleged breach of their

16  duty of care, they failed to present evidence as to the standard of care imposed on a reasonably

17  prudent mortgage broker under circumstances similar to those at issue.  Typically, proof of

18  professional negligence, as alleged by Plaintiffs, requires testimony of experts as to the standard of

19  care in the relevant community.  *See Carleton*, 14 Cal. App. at 754.  Here, however, Plaintiffs did

20  not present any expert testimony as to the standard of care owed by mortgage brokers, either through

21  a designated expert or through Tondelli or Potts.  Further, Plaintiffs failed to present any evidence as

22  to causation between Defendants' allegedly wrongful acts and Plaintiffs' injuries.  Given the limited

23  evidence before it, the Court cannot determine whether Defendants' alleged wrongful acts were

24  negligent. [13]  Accordingly, Plaintiffs are not entitled to relief on this claim.

25  ///

26

27      [13] On May 20, 2011, after the trial had ended, Plaintiffs filed a Request for Judicial Notice of the Mortgage Loan Broker Compliance Evaluation Manual issued by the State of California Department of Real Estate. (ECF No. 76-1.)  This publication identifies the obligations of mortgage brokers.  The Court denied Plaintiffs' Request on May 24, 2011, stating

28  it would not accept additional evidence at that stage of the proceedings.  (ECF No. 80.)

**G.      California's Predatory Lending Act, California Financial Code § 4970, et seq.**

In Count 7 of the Complaint, Plaintiffs contend Defendants' conduct violated California Financial Code § 4970, et seq.  Specifically, at trial Plaintiffs argued Defendants violated this statute when they failed to (1) disclose in writing an alternative to a loan with a prepayment fee, and (2) provide a consumer caution and home ownership counseling notice.

1.      The Law

In 2001, California enacted Financial Code Sections 4970 et. seq., also known as the "Predatory Lending Act," which regulates predatory lending practices in home loans if certain criteria apply.  One criteria is that "the principal amount of the loan does not exceed the current conforming first mortgage size limit for a single-family dwelling as established by the Federal National Mortgage Association.[14]  CAL. FIN. CODE § 4970(b).  If this criteria is met, then a consumer loan is a "covered loan" if one of the following two criteria is also met: (1) for a mortgage or deed of trust, the annual percentage rate at consummation of the transaction will exceed by more than 8 percentage points the yield on Treasury securities having comparable periods of maturity on the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or (2) that the total points and fees payable by the consumer at or before closing for a mortgage and deed of trust will exceed 6 percent of the total loan amount.  *Id.* at § 4970(b)(1)-(2).  For purposes of this statute, a "consumer loan" means a "consumer credit transaction that is secured by real property located in this state used, or intended to be used or occupied, as the principal dwelling of the consumer that is improved by a one-to-four residential unit."  *Id.* at § 4970(d).

California Financial Code § 4973(2) lists the following as prohibited acts and limitations for covered loans: "A covered loan may include a prepayment fee or penalty up to the first 36 months after the date of consummation of the loan if: (A) The person who originates the covered loan has also offered the consumer a choice of another product without a prepayment fee or penalty. (B) The person who originates the covered loan has disclosed in writing to the consumer at least three

_____

[14] From 2007 until 2010, the conforming loan limits for a single family was $417,000.

business days prior to loan consummation the terms of the prepayment fee or penalty to the consumer for accepting a covered loan with the prepayment penalty and the rates, points, and fees that would be available to the consumer for accepting a covered loan without a prepayment penalty."[15]

Further, "[a] person who originates covered loans shall not make or arrange a covered loan unless at the time the loan is consummated, the person reasonably believes the consumer, or consumers...will be able to make the scheduled payments to repay the obligation based upon a consideration of their current and expected income, current obligations, employment status, and other financial resources." *Id.* at § 4973(f)(1).

California Financial Code § 4973(k)(1) states that a covered loan shall not be made unless a written disclosure in 12-point font or larger containing mandated text and entitled "CONSUMER CAUTION AND HOME OWNERSHIP COUNSELING NOTICE" is provided.

California Financial Code § 4979.5 states that any person who provides brokerage services to a borrower in a covered loan transaction by soliciting lender is the fiduciary of the consumer, and any violation of the fiduciary duties shall be a violation of this section.

Pursuant to California Financial Code § 4978(a), "A person who fails to comply with the provisions of this division is civilly liable to the consumer in an amount equal to any actual damages suffered by the consumer, plus attorneys fees and costs. For a willful and knowing violation of this division, the person shall be liable to the consumer in the amount of fifteen thousand dollars ($15,000) or the consumers actual damages, whichever is greater, plus attorney's fees and costs."

2.   Discussion

With regard to the First Loan, the evidence presented at trial demonstrates this loan is not a "covered loan" as defined by California Financial Code § 4970.  In Exhibit 49, the Loan Purpose Statement for the First Loan signed by Plaintiffs on January 18, 2006, Plaintiffs indicated the proceeds of the First Loan were to be used primarily for the purchase, construction, or improvement of real property as well as for business purposes.  At trial, Plaintiffs testified the purpose of the First

---

[15]The Court has not included California Financial Code § 4973(2)(C)-(E) in its discussion as these provisions are not relevant to the issues presented at trial.

loan was to purchase the Dennis Court property and fix up and rent the San Diego property. Therefore, the First Loan is not a "consumer loan" as defined by California Financial Code § 4970(d), and consequently is not a "covered loan." Based thereon, the prohibitions and limitations for covered loans, as listed in California Financial Code § 4973, do not apply to the First Loan.

Conversely, the evidence presented at trial demonstrates the Second Loan is a "covered loan" as defined by California Financial Code § 4970. First, the Second Loan in the amount of $164,000 does not exceed the $417,000 conforming loan limit for a single family. CAL. FIN. CODE § 4970(b). Second, the total fees and commissions paid by Plaintiffs on the Second Loan of $13,340.16 was in excess of 6 percent of the total loan amount of $164,000.[16] Id. at § 4970(b)(2). Accordingly, the Second Loan is a "covered loan" and subject to the prohibitions and limitations imposed by California Financial Code § 4973.

With regard to the requirements set forth in California Financial Code § 4973(2)(A)-(B) for prepayment penalties, the evidence at trial demonstrates Plaintiffs were offered a product without a prepayment fee or penalty in relation to the Second Loan. Specifically, James Potts testified he informed Plaintiffs of an option without a prepayment penalty. However, the evidence at trial demonstrates this offer was not disclosed in writing to Plaintiffs three business days prior to consummation of the loan. Defendant Tondelli also testified he did not know whether the offer without a prepayment penalty was provided in writing to Plaintiffs. Therefore, Defendants violated California Financial Code § 4973(2)(B).

With regard to California Financial Code § 4973(f)(1), the evidence at trial demonstrates Defendants reasonably believed Plaintiffs would be able to make the scheduled payments to repay the Second Loan based on their income, current obligations, and employment status. The monthly mortgage payment on the Cahuilla Property was $1571.67. (Exhibit 9.) Exhibit 9, Plaintiffs' Uniform Residential Loan Application for the Second Loan, lists Plaintiffs' combined income as $6,246. However, Plaintiff Christopher Nero testified Plaintiffs' combined income was $3600. Despite the discrepancy in Plaintiffs' combined income, Defendants were reasonable to believe

---

[16] 6 percent of $164,000 is $9,840.00.

1    Plaintiffs would be able to make the almost $1600/month mortgage payments.  Further, Plaintiff

2    Christopher Nero testified on cross-examination that if his financial circumstances had not changed,

3    he would have been able to continue making payments on the Second Loan.  Therefore, Defendants

4    did not violate California Financial Code § 4973(f)(1).

5           With regard to California Financial Code § 4973(k)(1), the Court finds Plaintiffs received

6    and signed the Consumer Caution and Home Ownership Counseling Notice.  (Exhibit 48).  Although

7    Plaintiff Maria Nero testified she never signed this document, the Court finds Ms. Nero's signature

8    on the Consumer Caution and Home Ownership Counseling Notice to be the same as Ms. Nero's

9    signature on the Dennis Court Deed of Trust (Exhibit 2), and the April 18, 2006 Agency Agreement

10   (Exhibit 34).  Therefore, the Court finds Ms. Nero's statement that she did not sign the Consumer

11   Caution and Home Ownership Counseling Notice is not credible.  And regardless of Ms. Nero's

12   statement, Mr. Nero definitely signed the Consumer and Home Ownership Counseling Notice.

13   Accordingly, Defendants did not violate California Financial Code § 4973(k)(1).

14          With regard to California Financial Code § 4979.5, the Court finds Defendants did not

15   violate any fiduciary duties owed to Plaintiffs.  Accordingly, Defendants did not violate California

16   Financial Code § 4979.5.

17          As discussed above, Defendants sole violation of the Predatory Lending Act was their failure

18   to disclose in writing the terms of the prepayment fee or penalty, and the rate, points and fees that

19   would be available to the consumer for accepting a covered loan without a prepayment penalty, as

20   required by California Financial Code § 4973(2)(B).  However, Defendants' failure to provide an

21   alternative to a prepayment penalty in writing did not impact Plaintiffs in any way.  Plaintiffs never

22   had to pay any prepayment penalties on the Second Loan, and therefore suffered no actual damages

23   as a result of Defendants' violation of California Financial Code § 4973(2)(B).

24          In light of the fact Plaintiffs did not suffer actual damages, Plaintiffs are not entitled to

25   recover attorney's fees or costs.  California Financial Code § 4978(a) states: "A person who fails to

26   comply with the provisions of this division is civilly liable to the consumer in an amount equal to

27   any actual damages suffered by the consumer, *plus* attorneys fees and costs." (emphasis added).  "It

28   is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31(2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  Based on the plain language of the statute, there is no indication Plaintiffs are entitled to attorneys' fees and costs absent actual damages.  Therefore, because Plaintiffs did not suffer actual damages, Plaintiffs are not entitled to recover attorney's fees or costs.  CAL. FIN. CODE § 4978(a).

**H.      California Civil Code § 2923.5**

In Count 18 of the Complaint, Plaintiffs allege Defendants violated California Financial Code § 2923.5 by failing to assess Plaintiffs' financial situation and explore options to avoid foreclosure 30 days prior to filing the default.  Based thereon, Plaintiffs contend the foreclosure of the Cahuilla Property was wrongful.

California Financial Code § 2923.5(a)(2) provides that, prior to filing a notice of default, the mortgagee, beneficiary, or authorized agent must "contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure."  Further, California Financial Code § 2923(b) provides that "a notice of default filed pursuant to Section 2924 shall include a declaration that the mortgagee, beneficiary, or authorized agent has contacted the borrower, has tried with due diligence to contact the borrower as required by this section, or that no contact was required pursuant to subdivision (h)."

It is evident from the testimony at trial that Plaintiffs Christopher and Maria Nero were contacted by Nita Evans prior to the filing of a Notice of Default on the Cahuilla Property to assess their financial situation and explore options for them to avoid foreclosure.  Specifically, Plaintiff Christopher Nero testified Evans offered Plaintiffs two options to modify the Second Loan: (1) to stay in the Cahuilla Property by paying 3 years interest only, the back taxes due, and pay off the remainder of the loan, in whole, at the end of that 3-year period; or (2) Evans would pay all the back taxes, Plaintiffs would deed the property to Evans, Plaintiffs could stay in the Cahuilla Property for 3 years making reduced rental payments, and Plaintiffs would have the option to buy the house back at the end of the 3-year period for the loan amount.  Plaintiffs rejected both offers.  However, no evidence was presented at trial that anyone provided a declaration that the mortgagee, beneficiary, or

1    authorized agent had contacted Plaintiffs, as required by California Financial Code § 2923(b).  In

2    fact, Defendant Tondelli testified he was unaware if Evans provided Plaintiffs a written declaration.

3        Nevertheless, despite the failure to provide a declaration required by California Financial

4    Code § 2923(b), it is unclear from the testimony at trial whether Tondelli is an "authorized agent" as

5    envisioned by this statute, and therefore obligated to comply with this provision.  The testimony at

6    trial demonstrated that Evans was the lender on the Plaintiffs' Second Loan for the Cahuilla

7    Property.  Although Defendant Tondelli testified he had an agency agreement with Evans, it is not

8    clear from the testimony what that agency relationship entailed.  Specifically with regard to the

9    Notice of Default, Defendant Tondelli testified that he prepared and recorded the Notice of Default,

10   which identifies Presidio Mortgage, Inc., as the duly appointed Trustee and Nita E. Evans as the

11   original beneficiary, under the Deed of Trust executed by Plaintiffs.  (Exhibit 27.)  However, the

12   Declaration of Default and Demand for Sale lists Nita E. Evans as the beneficiary under the Deed of

13   Trust of the Cahuilla Property.  (Exhibit 42.)  Therefore, based on the limited evidence presented at

14   trial as to Ms. Evans' and Tondelli's agency relationship, and the evidence that Evans was the

15   beneficiary for purpose of the relevant statutes, the Court cannot determine whether Defendant

16   Tondelli is an "authorized agent" under California Financial Code § 2923.5.  Thus, the Court cannot

17   determine whether Defendants Tondelli and Presidio were required to assess Plaintiffs' financial

18   situation and explore options to avoid foreclosure 30 days prior to filing the default, as well as

19   include a declaration that they complied with these requirements.

20       However, even if this Court were to find that Tondelli was an authorized agent and thereby

21   required to file a declaration that he contacted, or that contacts were made with Plaintiffs to discuss

22   loan modification options, there is no remedy at law.  "The remedy for a violation of the statute

23   requiring a lender to contact the borrower to explore options to prevent foreclosure before filing a

24   notice of default is limited to obtaining a postponement of an impending foreclosure to permit the

25   lender to comply with the statute." *Mabry v. Superior Court*, 185 Cal. App. 4th 208 (2010).  Here,

26   foreclosure proceedings have already taken place and therefore, even if there is a technical violation

27   of the statute, there is no available remedy at law.  Accordingly, Plaintiffs are not entitled to any

28   recovery under this statute.

**I.      Breach of Contract**

In their Count 21, Plaintiffs allege Defendants breached the Agency Agreement by failing to properly carry out their duties as an agent.[17]  Plaintiffs contend Defendants failed to properly represent Plaintiffs' interests, failed to properly advise Plaintiffs and failed to properly warn Plaintiffs of any potential harms in entering a hard-money loan. Ultimately, as to the Second Loan, Defendants refused to modify its terms at Plaintiffs' request and recorded a Notice of Default on Evans' behalf.  At time of trial, Plaintiffs also seemed to allege that Defendants breached an oral contract to refinance the Second Loan after one year.

To state a claim for breach of contract under California law, Plaintiffs must establish: (1) the existence of a contract; (2) Plaintiffs' performance or excuse for nonperformance of the contract; (3) Defendants' breach of the contract; and (4) resulting damages.  CA BAJI 13.85 (Spring 2011 Ed.); *see also Armstrong Petrol. Corp. v. Tri Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n. 6 (2004) (citing *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990)).

1.      The 2006 Agency Agreement

There is no evidence in the record that Defendants failed to perform their duties under the January 18, 2006 Agency Agreement in connection with the First Loan transaction.  The agreement provides Presidio "agrees to use its best efforts during the Agency appointment to secure a lender to make Borrowers a loan" in accordance with the terms of the Mortgage Loan Disclosure Statement. (Exhibit 34.)  The Mortgage Loan Disclosure Statement, also dated January 18, 2006, states that if the loan is made, Plaintiffs agree to pay the principal amount of $350,000 and interest at 10.5% per year, payable in sixty monthly payments of $3062.50 and a final/balloon payment of $350,000 to pay off the loan in full.  (Exhibit 35.)  The record indicates the terms of the First Loan matched these terms.  Accordingly, Defendants performed their duty to fulfill the stated purpose of the 2006Agency Agreement, i.e., to find and secure a loan in accordance with the terms of the Mortgage

---

[17] While Plaintiffs' Complaint refers to a single Agency Agreement, Plaintiffs presented evidence of two agreements at trial: the 2006 Agency Agreement and the 2007 agreement.  Therefore, the Court will consider both agreements in regards to this cause of action.

1    Loan Disclosure Statement.  Thus, Plaintiffs are not entitled to relief on this claim.

2            2.       The 2007 Agency Agreement

3            Likewise, there is no evidence in the record that Defendants failed to perform their duties

4    under the January 9, 2007 Agency Agreement in connection with the Second Loan transaction.  The

5    2007 Agency Agreement also states Presidio "agrees to use its best efforts during the Agency

6    appointment to secure a lender to make Borrowers a loan" in accordance with the terms of the

7    Mortgage Loan Disclosure Statement.  (Exhibit 10.)  The January 9, 2007 Mortgage Loan

8    Disclosure Statement provides that if the loan is made, Plaintiffs agree to pay the principal amount

9    of $164,000 and interest at 11.5% per year, payable in sixty monthly payments of $1571.63 and a

10   final/balloon payment of $164,000 to pay off the loan in full.  (Exhibit 12.)  Plaintiffs admitted the

11   terms of the Second Loan matched the terms provided by the Mortgage Loan Disclosure Statement.

12   They further testified they were happy with the monthly payments under the Second Loan, as they

13   were approximately half the payments due under the First Loan.  Therefore, Defendants also

14   performed their duty to fulfill the stated purpose of the 2007 Agency Agreement, i.e., to find and

15   secure a loan in accordance with the terms of the Mortgage Loan Disclosure Statement.

16           Plaintiffs further suggest Defendants breached the terms of the 2007 Agency Agreement by

17   refusing to modify the terms of the Second Loan and ultimately recording a Notice of Default on

18   Evans' behalf.  However, as Mr. Nero acknowledged at trial, the terms of the 2007 Agency

19   Agreement do not require Presidio to refinance the Second Loan at Plaintiffs' request.  Indeed, the

20   agreement does not impose any obligations on Defendants after its express purpose – to find and

21   secure a loan in accordance with the terms of the Mortgage Loan Disclosure Statement – had been

22   satisfied.  In addition, the terms of the 2007 Agency Agreement do not prohibit Defendants from

23   preparing and recording the Notice of Default on Evans' behalf.  The agreement expressly states that

24   "a dual-agency relationship may exist as [Presidio] may also be an agent for the lender."  (Exhibit

25   10.)  Therefore, the Court cannot conclude Defendants' actions after securing the Second Loan

26   breached the 2007 Agency Agreement.  Based on the foregoing, the Court finds Plaintiffs are not

27   entitled to relief on this claim.

28   ///

3.    Oral Contract to Refinance

At trial, Plaintiffs seemed to argue there was an obligation to refinance the Second Loan after one year arising from an oral contract.  Apart from Plaintiffs' testimony of the existence of such an agreement, there is no evidence in the record of a promise or agreement that could rise to the level of a contractual obligation.  In fact, at deposition both Plaintiffs testified that there was no promise or agreement to refinance. Based thereon, the Court finds Plaintiffs are not entitled to relief based upon an oral contract.

**J.    Breach of Covenant of Good Faith and Fair Dealing**

In Count 3 of the Complaint, Plaintiffs contend the parties' Agency Agreements contained an implicit covenant of good faith and fair dealing requiring Defendants to act honestly and in good faith in the performance and enforcement of the contract.  Thus, even if Defendants did not breach the express terms of the Agency Agreements, Plaintiffs seem to argue Defendants' alleged predatory lending practices violated general principles of fairness.

Pursuant to California law, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) (quoting *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 658 (1958)). The "implied covenant of good faith and fair dealing is limited to assuring compliance with the *express terms* of the contract, and cannot be extended to create obligations not contemplated by the contract." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004) (emphasis in original) (citing 1 Witkin, Summary of Cal. Law (2003 supp.) Contracts § 743, p. 449).

Here, there is no evidence Defendants failed to comply with the *express terms* of the Agency Agreements, i.e., to find and secure a loan in accordance with the terms of the corresponding Mortgage Loan Disclosure Statements.  Plaintiffs testified that in both the First and Second Loan transactions, Defendants secured loans that matched the terms Plaintiffs agreed upon in the Mortgage Loan Disclosure Statements.  Because the Agency Agreements' implied covenants of good faith and fair dealing do not afford Plaintiffs relief for any alleged violations outside of the limited terms of the agreements, Plaintiffs are not entitled to relief on this claim.

**K.      California Civil Code § 1572**

In Count 19 of the Complaint, Plaintiffs contend Defendants' misrepresentations and failures to disclose material information during the loan application process constituted actual fraud in violation of California Civil Code § 1572.  Section 1572 defines five variations of "actual fraud" as follows:

> Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
>
> 1.      The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> 2.      The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
>
> 3.      The suppression of that which is true, by one having knowledge or belief of the fact;
>
> 4.      A promise made without any intention of performing it; or,
>
> 5.      Any other act fitted to deceive.

CAL. CIV. CODE § 1572.  This section "is limited to acts committed by one party to a contract with intent to deceive another party to the contract or to induce someone to enter into a contract." *Masters v. San Bernadino County Employees Retirement Ass'n*, 32 Cal. App. 4th 30, 41 (1995); *see also Wilkins v. National Broadcasting Co., Inc.*, 71 Cal. App. 4th 1066, 1083-84 (1999) (holding plaintiffs failed to state a cause of action under section 1572 because there was no contract between the parties).

The only contracts at issue between Plaintiffs and the remaining Defendants, Tondelli and Presidio, are the 2006 and 2007 Agency Agreements.  (*See* Exhibits 10 and 34.)  Yet, Plaintiffs failed to present evidence of fraud or deceit with regard to these agreements.  Plaintiffs have not alleged, nor does the Court find, Defendants fraudulently induced Plaintiffs to enter the Agency Agreements or suppressed material facts concerning the parties' rights and obligations under these agreements.  Additionally, Plaintiffs failed to present evidence of any damages proximately caused by any violation of section 1572.  Based on evidence presented at trial, the Court cannot find Plaintiffs are entitled to recovery on this cause of action.

**L.      California's Unfair Competition Law, Business and Professions Code §§ 17200, et seq.**

In Count 16 of the Complaint, Plaintiffs allege Defendants violated California Business and Professions Code §§ 17200, et seq., by "consummating an unlawful, unfair and fraudulent business practice, designed to deprive Plaintiffs of their equity in said property." (ECF No. 1 at 25.)

California Business and Professions Code § 17200, et seq., commonly known as California's Unfair Competition Law, defines unfair competition as "any unlawful, unfair, or fraudulent business act or practice." CAL. BUS. AND PROF. CODE § 17200. To state a claim under the Unfair Competition Law, Plaintiffs must allege facts sufficient to show a violation of some underlying law. *People v. McKale*, 25 Cal. 3d 626, 635 (1979). As set forth above, Plaintiffs have established violations of California Financial Code § 2923(b) for failure to provide a written declaration of due diligence and California Financial Code § 4973(2)(B) for failure to disclose in writing the terms of the prepayment penalty. However, no evidence was presented that these two technical violations are sufficient to constitute a violation of California Business and Professions Code §§ 17200, et seq. Accordingly, Plaintiffs are also unable to recover on this claim.

**M.      Accounting**

Finally, in Count 10, Plaintiffs request an accounting of the "amount of money due, if any from Plaintiffs to Defendants." (ECF No. 1 at 17.) Plaintiffs also testified they requested an accounting from Evans. However, Evans is no longer a Defendant in this case. Further, no evidence was presented that Tondelli or Presidio owed Plaintiffs a duty to present an accounting. Evans was the lender and serviced the loans at issue, not Defendants. Accordingly, Plaintiffs are not entitled to recover on this claim.

///

///

///

///

///

///

///

09cv958

1

## VI. CONCLUSION

2          Based on the foregoing, the Court directs the clerk to enter judgment in favor of Defendants

3   and against Plaintiffs, and that Plaintiffs are to recover nothing, including attorney's fees and costs.

4          **IT IS SO ORDERED.**

5   DATED:  July 8, 2011

6

7                                                    LOUISA S PORTER
                                                     United States Magistrate Judge
8

9   cc:          The Honorable Dana M. Sabraw
                 The Honorable Peter C. Lewis
10               All parties

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28